The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Our next case is 20-1655, North Carolina Department of Environmental Quality versus Federal Energy Regulatory Commission. Thank you, Madam Clerk. And we have a couple of lawyers here in the on the side of the appellants. Mr. Moore, you first up? Yes, Your Honor. Thank you, Judge King. May it please the court? Who do you represent, Mr. Moore? Yes, sir. I represent PK Ventures, which is the owner of this dam that's at subject issue in this case. All right, sir. Good to have you with us. Thank you, sir. And what is it that you, what is it that you want? Tell me that. We would like you to avoid this license issued by FERC, and that would dispose of this fight between the federal government and the state here. Okay, sir. May it please the court? Go right ahead. I'd like to take you to the Hall River in Bynum, North Carolina. That's about 20 minutes to the west of Raleigh, where PK Ventures, my client, owns a dam. It's a small dam. The river small, it's probably about 20% the size of James River. And the dam there used to many years ago, 10 years ago, last time it generated was 2010. It produced about 600 kilowatts, which would generally provide power to about 400 to 500 homes, although if you know something about hydropower, it can't run 24-7. So I'm talking about a very small project. And my client, PK Ventures, bought this in 1986. And they're asking this court to please void the license that was issued by FERC in September 2020. Because if you don't void the license, then my client's going to lose this dam. They're going to lose the dam, they're going to lose the water rights, they'll lose the land around it. Because FERC has illegally decided to issue a license to a third party, McMahon Hydro. And interestingly and curiously, they're not here today, Your Honor. And in fact, they didn't get involved in any of the proceedings below and they didn't come here in the Fourth Circuit to explain to you what was going on. Who's not here, you say? McMahon Hydro. They're the company that FERC has issued the license for our dam. They're the ones that want to run you out and put them in, right? They want to run us out, yes, sir. And there's an ability, if they get the license, they can condemn that property. They can condemn the land, the water, the hydropower, the dam, the whole thing. And we don't want that to happen. We have other plans for it. The reason and the basis is that there's no jurisdiction under the federal... Excuse me, this is Judge Packer. You're faulting them for not being here, but did your client submit its own application? Yes, Your Honor, we did. Yeah, we did in 2015, Your Honor. Or no, it was actually 2013. Where is that in the record? Well, I don't think that was... The index, if you're involved with a FERC proceeding, they're pretty big. I'm not sure that that notice of intent is what it's called is in the record, Your Honor, but I can... Okay, so for our purposes, you didn't file for an application because I can't find it anywhere in this record. Well, the reason that you know that we did is that we were granted intervention status below by virtue of the fact that we're the owner of it and we have filed previous documents and a notice of intent. It's actually referenced in some of the court orders, Your Honor, that... I mean, not the court orders, the FERC orders below. I've got a very short... Yeah, I've got a very short period of time. Put very simply, under the Federal Power Act, on this water body, unless the project were to produce power, there is absolutely no authorization. And this comes from the Interstate Commerce Clause, Section 1, Article 1, Section 8. This court itself, in a similar case, Nana Hale of Power and Light, held that the test of whether or not the Interstate Commerce Clause is triggered under the Federal Power Act is whether there's a presently discernible effect on commerce. That's at page 286, 384, Fed Second 206. What FERC says is that the reason they have jurisdiction is that this project will affect commerce. And that runs afoul of Nana Hale of Power and Light. It also runs afoul of the Supreme Court's decision in Federal Power Commission versus Union Electric, where they said that it's beyond Congress's power to issue a license on a non-navigable stream that doesn't generate power. And in fact, we've cited many cases where a facility didn't generate power into interstate commerce and FERC decided on its own that it didn't need a license. So including my time, it would be an advisory opinion to rule on that government-to-government fight that you're about to hear about in Section 401. So we'd like to invite the court to please rule on the jurisdictional issue and the rest would be advisory. Thank you, Your Honors. Thank you, Mr. Bohr. We appreciate it. And Ms. Spiller? Yes, good afternoon, and may it please the court. Asher Spiller for the North Carolina Department of Environmental Quality. Under Section 401 of the Clean Water Act, a state waives its authority to issue a water quality certification if the state fails or refuses to act on a certification request within one year of receipt of such request. In this case, FERC erred in determining that North Carolina waived its certification authority for the Bynum Hydroelectric Project because North Carolina did not fail or refuse to act on McMahon Hydro's certification request within one year. In fact, DEQ issued McMahon Hydro a 401 certification with conditions necessary to protect North Carolina's Haw River, and it did so well within one year of receipt of McMahon Hydro's February 2019 request. The fact that McMahon submitted prior requests and made the choice to withdraw those requests has no bearing on the waiver analysis requirement of the statute. I'd like to make three main points today. First, the commission's waiver criteria cannot be reconciled Mr. Spiller, I can't hear you very well. I don't know what the issue is. I'm sorry, your honor. Can you hear me now? Are you too close to the speaker or too far from the speaker, maybe? Go ahead. I apologize. Can you hear me now, your honor? I think that's better. Yeah. Okay. So again, three points today. The first is that the waiver is not reconciled with the text of the act. Second, the commission's waiver determination is not compelled by the DC Circuit's decision in Hoopa Valley. And finally, the commission's determination is not supported by substantial evidence in the record, which is an independent basis for vacating the waiver determination. Courts have consistently held that section 401 establishes a bright line for determining when a waiver occurs. And this bright line is crucial not only because it ensures timely action by the states, which it certainly does, but because it gives states clear guidance on when their statutory authority to protect their surface waters is waived. And these waiver decisions are no small matter. They can have significant consequences for states and for the environment. And because licenses issued by the commission, like this one for McMahon Hydro, last for decades, in this case, 40 years. And once the commission declares that a waiver has occurred, the activity moves forward without the conditions that the state would waiver test in this case departs from the bright line that Congress established, because unlike the statutory text, the commission's test does not require a failure or refusal to act on the part of the state. Under the commission's test, if an applicant makes the choice to withdraw and resubmit its certification request, the state is deemed to have waived its certification authority if two conditions are met. Conditions which appear nowhere in the statute. The first condition is that there was some level of coordination between the applicant and the state that the commission decides is sufficient. And the second is that the applicant's new application is substantially unchanged in some sense. Now, beginning with the concept of coordination, it's very difficult when reading the commission's brief in this case to pin down what the commission really means by sufficient coordination and looking at the waiver determinations. In this case, it's easy to see that this concept is not just poorly defined, but it's completely ungrounded in the statutory text. The commission found two waivers in this case. The first was in 2018 when McMahon Hydro contacted the agency to request information on how to withdraw and resubmit its application. And the agency simply responded, identifying the paperwork that McMahon Hydro would need to submit. The second was in 2019 when McMahon Hydro again communicated to the agency that he desired to withdraw and resubmit his application. And a staff engineer sent an email simply reminding McMahon Hydro of the February 2019 statutory deadline. In both of these circumstances, the choice of whether to withdraw and resubmit the 401 application rested entirely with McMahon would have acted on. Nonetheless, in both of these situations, the commission apparently believed that DEQ's mere communication with McMahon Hydro regarding its voluntary choice to withdraw gave rise to a waiver. The commission simply does not explain how DEQ's communication with the applicant regarding the applicant's decision to withdraw constituted a failure or failure. The departure from the bright line that Congress established has also led to blatantly inconsistent decision-making. In cases like Village of Morrisville and KEI Power, which the commission issued just months after DEQ filed its opening brief in this case, the commission reached opposite conclusions on facts that are materially indistinguishable. In those cases, the applicants withdrew and resubmitted their certification request to restart the statutory clock and to avoid receiving decisions from the states in those cases that they viewed as unfavorable. The commission found no waiver occurred in those cases, even though those withdrawals were preceded by communication... Mr. Spiller, when you refer to the commission, you're talking about FERC, right? Yes, Your Honor. Yeah, I'm right. All right. And the commission found... I'm sorry, Your Honor. Is there another question? No. Okay. I'm sorry. The commission found no waiver in those cases, even though those withdrawals were preceded by communications from the states instructing the applicants regarding the withdrawal and resubmission process, communications that were very similar to the ones that occurred in this case. And the notion that a waiver of a state certification authority could turn on FERC's in establishing a bright line under Section 401. In these cases, the commission stated that the states should not be blamed when an applicant decides that withdrawing and resubmitting its application to avoid an unfavorable action by the state is in its interest. And the commission offers no reasonable basis and can offer no reasonable basis for reaching a different conclusion in this case than it reached in those cases. The commission's second criterion, other than the coordination criteria, is that the resubmitted application is substantially unchanged in some sense. And that criterion is also unsupported by the statute. There's two points I want to make on this issue. The first is that when an applicant withdraws its certification request, there's simply no more requests for the state to act on. And at that point, the extent to which any new requests from the applicant is similar to one that has been withdrawn is simply relevant under the statute. The statute provides that the waiver period runs from receipt of the request that's actually pending before the agency, regardless of whether similar requests have been previously withdrawn. The second point I want to make is that like the coordination criterion that the commission has identified, this one, the substantially unchanged idea, it's difficult to understand what the commission means by this concept as well. We certainly don't dispute that in this case, when McMahon Hydro submitted his new certification requests, he didn't append new information at that precise moment. But it is certainly not the case that these requests were no different from the requests that were submitted a year prior. And the commission knows this. The 2018 requests, for example, had a draft water quality monitoring plan included with it that was not included in the 2017 requests. The 2019 requests had an environmental assessment and a revised water quality monitoring plan that were not included in the 2018 requests. So this isn't a case like Hoopa Valley, for instance, where you had a complete application that gets withdrawn and resubmitted with no changes in the interim. And that moves me to my next point, your honors, which is that the commission's decision in this case is in no way compelled by the D.C. Circuit's decision in Hoopa Valley. The commission has to ignore large portions of the D.C. Circuit's reasoning in that case to make its argument. As the D.C. Circuit expressly pointed out in Hoopa Valley, that case involved what the court called deliberate and contractual idleness. The parties entered into a contract that was binding on the and required the applicant to repeatedly withdraw and resubmit identical applications for the express purpose of avoiding a waiver. Now, in finding that the state's actions constituted a failure or refusal to act within the meaning of Section 401, the court expressly pointed to the existence of a contract. In this case, there was no agreement that was written or otherwise between D.E.Q. and McMahon, and the commission does not appear to argue that there was in its brief. Also in Hoopa Valley, the court pointed to the fact that the states and the applicant did nothing to advance the 401 application for more than a decade. In this case, the record shows that D.E.Q. worked diligently with McMahon Hydro to identify the information that the agency would need to arrangement in Hoopa Valley had the effect of shutting third parties out of the process, which the court stated was a relevant fact. And not only are there no third parties seeking this waiver determination here, the applicant, McMahon Hydro, didn't even ask for it. The only party seeking to invalidate D.E.Q.'s certification in this case is FERC. Now, in the unlikely event that the court believes Hoopa Valley compels the commission's Now, I want to turn to my final point. I see I'm running out of time. The commission's waiver determination should also be vacated for the independent reason that it is unsupported by substantial evidence. In its waiver decision, the commission made two critical findings. The first was that when McMahon withdrew and resubmitted its request in 2019, it was at the direction or behest of D.E.Q. The second was that the 2018 withdrawal was not unilateral, a unilateral action by the applicant. And both of those findings are incorrect and lack support in the record. The commission does not even defend in its brief its initial finding that D.E.Q. directed McMahon Hydro's actions. And I see that I'm out of time, so if there's no questions, I'll reserve the remainder of my time for a bubble. Yeah, you saved some time, Ms. Spiller. We appreciate it. Ms. Chu? Yes, Your Honor. Thank you for having us here today. May it please the court, Susanna Chu for the Federal Energy Regulatory Commission. Yes, ma'am. Good to have you with us. Thank you. If it's all right with the court, I'd like to start with the arguments of North Carolina D.E.Q. As Mr. Spiller correctly notes, the statute is a bright line rule. The commission here is doing the best it can to apply this express statutory directive. As interpreted by the courts of appeals, the decision was compelled by both the language of the statute itself and the decisions in Hoopa Valley and also in the New York State D.E.Q. case, which was a Second Circuit 2018 decision. Here, the commission's determination on these two prongs that the withdrawals and resubmissions were not, they weren't voluntary withdrawals and were not new applications that would restart the one-year clock. These determinations come straight out of the statute itself and also as interpreted by the case law. The statute says that a state waives certification authority by failing or refusing to act on a request for certification within one year after receipt of such request. We know the one-year period runs from when a state receives an application and a state cannot deem an application incomplete to give itself more time. That's both City of Fredericksburg and the New York State D.E.C. case, which are both cited in our brief. Now, Hoopa Valley sheds light on when a withdrawal and resubmission of an application may actually be a state failure to act. And that's where the coordination and the question of whether there's a new application come in. Ms. June, this does fracture. Let me ask you a question. Does the commission attribute some nefarious purpose to these withdrawals and removals of the request between the North Carolina and the prospective dam owner? No, Your Honor. The commission did not find that there was any for the statute is whether the state is trying to give itself additional time, which it seemed to me if you give me just a second. Of course, my recollection is that one of the reasons for the withdrawal was that North Carolina couldn't prepare its conditions until the commission had finished its economic assessment. If I'm right about that, correct about that, isn't that a perfectly legitimate reason to delay? So, yes, Your Honor, you are correct that one of the reasons the state gave that for not being able to complete its review was that it needed both the commission's environmental assessment and also a water quality monitoring plan from the applicant. But that's from the city of say that a state cannot deem an application incomplete and restart the clock by saying that they don't have sufficient information. The bright line is one year from the date of receipt, which is March 3rd, 2017 here. What if it is incomplete? What if it in fact is incomplete? That means it has to be denied then, is that right? That's right. It can be denied without prejudice if it is in fact incomplete. Well, and if it's denied without prejudice, they can start over, I guess. That's a choice you made without prejudice. Exactly, Your Honor. Well, that gets around the bright line rule. Right. But yes, but our understanding, Your Honor, is that in that situation. Right. Well, that's a court's one court's characterization of the one year period in Section 401. We recognize that there are instances where it's really not such a bright line. And the agency here is just trying to do the best it can to apply it to the facts of each individual case. And responding to something that Mr. Spiller mentioned, it is the commission's obligation to apply the statute to each case that comes before it. I mean, it has an independent obligation to apply the law, whether or not it's raised to the agency. So in this case, you know, the commission. Well, if you can do it without prejudice, there must be an element of equity that goes into this thing, too, then. Right. So it's really not a bright line rule. You just call it a bright line rule. Right. Well, the bright line rule language came from a Second Circuit decision, Your Honor. So it's not the commission's language. So I think it was, you know, the court's effort to make clear that, you know, this one year rule is there for a reason. It is there to prevent undue delay by the states. The Hoopa Valley Court made clear that. It's better on the merits, isn't it, as a general proposition, rather than throwing it out on some so-called bright line rule that's not always applied. Right, Your Honor. Yes. Well, on the merits, I mean, that's where the commission made its decision. You know, it parsed the record and the communications and it made the determination that what happened here was not an entirely voluntary withdrawal. The commission recognizes, and as you'll see from some of the commission's cases, the Village of Morrisville case and the KEI Maine case, the commission recognizes that there are instances where an applicant withdraws and resubmits its application for its own reasons, either for some strategic reason or because it has to examine the project or examine alternatives for the project. So that was the case in Morrisville, and none of those factors were present here. The commission made the decision that these resubmissions were not new resubmissions. They weren't new applications. There's nothing substantially changed about this application request from the time it was submitted in March 2017 to the time that North Carolina issued the water quality certificate in 2019. And I'll also note that this factual decision that the commission made about the applications not being new was not challenged in North Carolina's opening brief. So I think that that issue is waived. What was challenged is the voluntariness of the withdrawals. And again, there, I think there is substantial evidence supporting the commission's decision that McMahon wasn't withdrawing its application here for its own reasons. It was doing it to accommodate the state. And our understanding of the law is that the state just can't give itself more time. It's not about whether the state is doing anything nefarious, but it can't give itself an extension under the law. Ms. Chu, this is Judge Fracture again. When North Carolina wanted a rehearing on the denial of their request, they submitted a declaration from one of their staff members that the commission dismissed as being unconvincing and irrelevant. On what factual basis did they make that decision? Right, Your Honor. I think the commission found that the declaration submitted by Ms. Higgins was not helpful because it didn't actually show that the applicant's withdrawal was truly voluntary. There's actually no real dispute about the facts in this case. The communications are mostly email communications. There's some discussion of in-person meetings that North Carolina staff had with McMahon. But what we have is the facts do show that the state first was viewing the application as incomplete, which even under the City of Fredericksburg and New York State DEQ, we see that that's not the operative date. The trigger date is not when the state considered the application complete. It's when the state actually receives the application. Second, the record also shows that these withdrawals were preceded by communications from the state agency to the applicant saying that they wouldn't be able to complete the review in time. So it's in response to those communications and to the reminder emails. But you say there's nothing nefarious about that. Well, no, I mean, it's not. You're against them. You say there's nothing wrong with it, and then you say that you're against them. Right. Your Honor, I guess I mean that there's nothing nefarious, immoral about it. It's just that the commission didn't make a determination that the state was doing this for some very bad purpose. It's just that the state was trying to give itself an extension. I'm sorry. I'm sorry. I didn't hear you, Your Honor. I said in retrospect, then, coming up here and arguing before us and trying to answer Judge Traxler's difficult questions, you may have been better off to have made such a finding. Ms. Chu, this is Judge Traxler again. Did you finish, Judge King? Yes, sir. You're right ahead. Okay. Ms. Chu, when I step back and look at this case, and it's apparently clear that there's no nefarious purpose in these extensions and discussions that have been going on between North Carolina and McMahon, the delays appear legitimate, and there's no objection to these conditions that North Carolina wants to add in. I don't understand where the problem is. Right. Your Honor, the problem is Section 4 of the Clean Water Act and the federal regulatory licensing scheme that Congress was intending to protect. Well, I said there was no nefarious purpose. The law just makes clear that the state is not allowed to give itself more time than one year. That's where the commission made the difficult determination on the facts that the state was trying to give itself more time here. It did have all of the information that was required to issue a decision, and it could have issued a decision earlier than it did. It could have issued a decision within the one-year period, or it could have denied without prejudice. So, with that understanding, the commission made the decision that the state had waived its certification authority. Well, it sounds to me that either method you choose to extend the time is just playing games. It's either denying without prejudice, which means nothing, or it's giving an extension, which means nothing. Right. Your Honor, I think that's the result of the statute. Ms. Chiu, you're saying that there's a straw man kind of thing in here, a front person situation, that they're the ones that spokesman for the other. I'm not sure I know what you mean, Your Honor, about a straw man. Well, I don't know. I'm just using that, but we get these things that come up here in these criminal cases. There's different language spoken, but one's a front. You're saying that's what it is, and that usually involves nefarious conduct, and you specifically disavow any nefarious conduct. But you say it's all right to give a dismissal without prejudice. That would accomplish the same thing. Right, and that's the commission's understanding from the New York State DEQ decision that a denial without prejudice is legitimate under the statute, but under other case law, a withdrawal and dismissal is not legitimate. It's just not permitted. So I do think that... Anything else? Do you have anything else? Briefly, I think I should address the jurisdictional arguments that Mr. Moore has raised. I just wanted to point out that this is not an ordinary property. When Pre-K Ventures bought this dam, it was a licensed hydroelectric project. And to Judge Stacker's question, no, the Pre-K Ventures did not file an application for a license with FERC. It actually, in 2013, filed a notice of intent to file a license application, but thereafter it failed to file the application itself. And at JA-287, Your Honor, there is a commission order granting a request by Pre-K Ventures to revoke a license transfer, because previously the commission had transferred the license from the previous owner to Pre-K Ventures, excuse me, Pre-K Ventures, when Pre-K Ventures purchased the property. So I'm not really sure what Pre-K Ventures' stake in this litigation is, apart from its ownership. You know, I understand that they are concerned about eminent domain, but they did not file the FERC license. And this is a property that was a licensed hydropower project. And it's being used for the benefit of the residents of North Carolina. It's the development of a project on a national resource, the Haw River. And I think our briefs demonstrate why FERC has jurisdiction to issue the license. Yes, Ms. Hsu. I'm sorry, go ahead. Ms. Hsu, this is Judge Traxler again. I'm getting even more confused. I'm looking at a decision from FERC. It's KEI Maine Power of 2020, FERC decision, where they concluded that a withdrawal and submission by the applicant did not give rise to a waiver, because the withdrawal was not done at the behest of the state agency. And they reached this conclusion despite the existence of an email from the agency telling the applicant to, quote, submit what you have along with the statement regarding withdrawal and resubmit. Once you've withdrawn and resubmitted, you can then submit additional comments. Now, tell me what the difference is between what FERC approved in this KEI Maine case and what's going on in this case. Sure, Your Honor. So, KEI Maine was a different case. In that case, the applicant withdrew and fish passage measures. So, it was in settlement discussions, various negotiations with different state and federal agencies. So, the reason was, the difference is, the reason they're withdrawing and resubmitting, that's what's important? The reason? Right, right. It was voluntary. It was a voluntary withdrawal for the benefit of the applicant, not for the benefit of the state. It wasn't direct, you know, it was for the benefit of the applicant primarily. Isn't the benefit, I'm confused. I'll just, I'll give up. I'm sorry, Your Honor. I don't, it's, I would love to help clarify the distinctions between Morrisville and KEI Maine and this case. I understand that the fact patterns get a little complicated. I mean, Morrisville is another example, if I could just briefly touch on it. It was a situation where the applicant withdrew and reapplied, but it was doing so because it was, it was looking at a possible change to the project, a possible physical change involving the use of micro turbines. It was looking at flow studies. It was preparing cost benefit analyses of different water quality certification conditions. So it was, again, that withdrawal was because the applicant wanted to give itself more time. And the difference here is that the state was trying to give itself more time, which it's not allowed to do under Section 401, as interpreted by the courts. I understand, Your Honor. Anything else, Mr. No, I understand that this is a, this case involves a lot of fact parsing. And I just want to say the commission did the best it could to parse all of these facts consistent with the statutory language as interpreted by the courts of appeals. And I don't think that this case represents a reason for departing from the decisions in Hoopa Valley or New York State DEQ, which I recognize are not binding on this course, but I believe that it's, that this case is in line with those cases. Thank you. Thank you very much, Ms. Chu. We appreciate it. Thank you. Good to have you with us. Mr. Moore? Yes, Your Honor. Are you out there, Mr. Moore? Yes, sir. Okay. One minute rebuttal. What we just heard on this Clean Water Act 401 issue to me was, frankly, it sounds like a fight between two governments on a matter of principle, because North Carolina issued that 401 basically the next day after the license order was issued. And here we are taking the time of the Fourth Circuit, and I don't know how many states we've got involved in this for something that really is just a fight on a matter of principle between two governments. The real issue, Your Honor, is it, you know, does FERC have jurisdiction? And the answer is no. FERC's position is dangerous. If their position prevails that any project that will affect interstate commerce in the future, if that's correct, first, Nantahala has got to be distinguished. In this case, Union Electric, the Supreme Court case, has got to be distinguished as well. And this is a dangerous precedent for property in the United States and for property owners. We have a right not to produce hydropower. That's a right that we have under the Constitution, and we ask the Court to not render an advisory opinion on the 401 but to rule on the jurisdictional matters that we've raised. Thank you. Thank you, Mr. Moore. Ms. Speller? Thank you, Your Honor. Just a few brief points. Ms. Chiu repeatedly stated that the state is trying to give itself more time, and that's simply not an accurate characterization of the record. DEQ did not direct McMahon to withdraw and resubmit its certification request. If McMahon had not withdrawn and resubmitted, DEQ certainly would have acted on the request. McMahon's certification request may well have done what Ms. Chiu said is authorized under the statute, which is to issue a denial without prejudice. The applicant made a choice that rather than allow the state to do that, it wished to withdraw and resubmit to restart the statutory clock. So we take issue with the characterization of the record. The other point I want to make is that the Commission has repeatedly stated that this was not entirely voluntary. And yet, at the same time, as Judge Traxler pointed out, they dismissed outright Ms. Higgins' declaration in this case, which expressly goes to that issue. Ms. Higgins explained that DEQ never directed McMahon to withdraw and resubmit his certification request. That was a choice that applicant made. The final point I wanted to make, Your Honors, is that the Commission argues that DEQ is claiming that we get to say when the one-year period starts, and that's whenever we deem the application complete. We have never made that argument in this case. The Commission acknowledges that the Department, DEQ, can deny a certification request if it lacks sufficient information to ensure compliance with water quality standards. In this case, DEQ may very well have done that. McMahon chose to withdraw and resubmit to give itself more time and to give the Commission more time to produce the information that DEQ needed to issue a certification, which it ultimately did with conditions that the state deemed necessary to ensure protection of water quality. And unless the Court has further questions, I'll just briefly conclude. The Commission... I got a question. I have a brief question for you. It's a little bit off the point, maybe, you might think. But this is part of the Cape Fear Watershed, this Haw River, correct? Correct, Your Honor. How many dams are there between this Byron Dam and the Atlantic Ocean down there at Wilmington? I apologize, Your Honor. I don't know the answer to that. Well, you're the North Carolina guy. That's the reason I was asking. Oh, my. All right. Go ahead. Finish up. Yeah, I'll just briefly close. So the Commission's we-know-it-when-we-see-it test not only conflicts with Section 401, it provides states with no guidance as to how to ensure that their statutory authority to protect their waters is not deemed waived. And we simply ask that the Court apply the statutory text and vacate the Commission's decision in this case so that North Carolina's 401 certification and the water quality protections it imposes can take effect. Thank you very much. Thank you, sir, very much. And if we were in Richmond, members of the panel would come down and we'd tell all three of you that you've done a good job. That is good to have you here. We're not able to do that. So we'll just adjourn court for the day and perhaps, for some of us, for the week. Madam Clerk, would you do that, please? Yes, sir. This Honorable Court stands adjourned until tomorrow morning. God save the United States and this Honorable Court. Thank you.
judges: Robert B. King, Stephanie D. Thacker, William B. Traxler Jr.